UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CHARLENE GIVENS-KEEFER,
                          Plaintiff,

-v-

AMERICAN EXPRESS COMPANY, *et al.*,
                          Defendants.

18-CV-4164 (JPO)

OPINION AND ORDER

J. PAUL OETKEN, District Judge:

       Plaintiff Charlene Givens-Keefer brings this action *pro se* against Defendants American Express Company, American Express Travel Related Services, Inc., Susan A. Zhang, and Danielle Wallis (collectively, "American Express"), pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12112 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*[1] (*See* Dkt. No. 33 ("AC").) Plaintiff alleges that American Express discriminated against her on the basis of her race, gender, age, and perceived disability. American Express now moves to compel arbitration and to dismiss the amended complaint. (Dkt. No. 41.) For the reasons that follow, the motion to compel arbitration is granted, the motion to dismiss is denied, and the case is stayed.

---

[1] It is well established that the Court is obligated to interpret a *pro se* complaint "to raise the strongest claims that it suggests." *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (internal quotation marks, citation, and alterations omitted). Accordingly, this Court concludes that the Amended Complaint, while it does not do so explicitly, also attempts to state a claim under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 *et seq.*

## I. Background

Plaintiff Charlene Givens-Keefer is an "African American [m]ixed [r]ace" woman over the age of 50. (AC ¶ 16.) On January 4, 2011, she began working at Defendant American Express Travel Related Services Company, Inc. as a Senior Manager in New York City. (AC ¶¶ 17, 77.) Givens-Keefer alleges that she never signed an arbitration agreement before she began working. (AC ¶ 77.) Around August 2011, Givens-Keefer "suffered several episodes of clinical medical symptoms," both at work and during her commute. (AC ¶ 21.) Her doctor recommended that she become a virtual employee and be allowed to work from home. (*Id.*) Around September 2011, her request to work from home was "readily approved." (AC ¶ 22.) She began doing so and worked from home until 2015. (AC ¶ 23.) Givens-Keefer alleges that she was a strong performer and received high performance reviews throughout her time as a virtual employee. (*See* AC ¶¶ 18–19, 23–24.)

In February 2015, American Express conducted a "large scale . . . [r]eduction [i]n [f]orce." (AC ¶ 25.) Givens-Keefer was one of a small number of employees who were retained despite the fact that most of the positions in her group were eliminated. (*Id.*) As a result of the reduction in force, Givens-Keefer was tasked with the responsibilities of four to six employees and was asked to come into the office more frequently. (AC ¶ 29.) When she raised her concerns about her workload to Defendant Danielle Wallis, Givens-Keefer was asked to "keep things afloat" until a new group leader could be hired. (AC ¶ 30.)

In April 2015, Defendant Susan Zhang was hired as that group leader. (AC ¶ 31.) Within a few weeks of starting, Zhang mentioned that senior leadership told her that Givens-Keefer was a top performer, and informed Givens-Keefer that she would "no longer receive that type of rating or performance evaluations under her leadership." (AC ¶ 32.) Zhang also stated that she "did not like virtuals," and asked Givens-Keefer "in front of other colleagues

2

and peers at the office" how she had become a virtual employee and asked "what kind of disability [she had]." (AC ¶¶ 33–34.) Zhang further publicly asked "about [Givens-Keefer's] family status, and about the health and perceived disability of her family members." (AC ¶ 35.)

In Fall 2015, Zhang conducted a meeting with the entire team. (AC ¶ 39.) In that meeting, she expressed that she was impressed that "all of us ha[ve] accomplished so much at such a young age . . . except one of us." (*Id.*) Givens-Keefer was the only team member older than 40. (*Id.*) On a business trip with Givens-Keefer, Zhang expressed that Givens-Keefer was "aging out" of her job, and pointed out that she was younger and more highly ranked than Givens-Keefer in front of an "influential external business partner." (AC ¶ 41.) Zhang also loudly and publicly disparaged Givens-Keefer on numerous occasions both about her perceived disability and age. (*See* AC ¶¶ 36–38, 40–42, 47, 52–54.)

When Givens-Keefer met with Zhang to address her behavior and ask that she stop, Zhang "admitted to the behaviors," and said, "I guess I just don't like you. I don't like that you are virtual. You are not an Alpha and this company needs Alphas or you don't belong. You have been aging out of this position too long, our Alpha[]s are in the early stage of their careers." (AC ¶ 43.) In the spring or summer of 2015, Givens-Keefer had "skip-level" meetings with the head of the group, Executive Vice President Gunther Bright. (AC ¶ 45.) He "stated that he was impressed w[ith] her performance and vowed to support [Givens-Keefer's] promotion and would provide[] internal sponsorship and references for [such] a promotion." (*Id.*) Zhang began excluding Givens-Keefer from important meetings and forbade her from having further meetings with Bright. (AC ¶¶ 44, 46.)

In Fall 2015, Givens-Keefer contacted the Omsbudsman to complain about Zhang's behavior, but it did not abate. (*See* AC ¶¶ 49–50.) Givens-Keefer suffered a "medical

3

emergency" while working. (AC ¶ 51.) When she informed Zhang about her medical emergency, Zhang stated that the work still "needed to continue" despite the emergency. (*Id.*) In November 2015, Zhang removed Givens-Keefer's direct report while she was on a business trip. (AC ¶ 53.) When Givens-Keefer returned from the trip, Zhang indicated that the direct report was removed because Givens-Keefer was a virtual employee. (AC ¶ 54.) In late November 2015, Givens-Keefer became ill enough that her doctor advised that she needed to take immediate short-term disability leave. (AC ¶ 55.) When she told Zhang that she needed to go on leave, Zhang expressed her displeasure that Givens-Keefer would be going on medical leave, delegated numerous work-related tasks to Givens-Keefer to be completed over that weekend, and asked her to report back to work the following Monday against her doctor's advice. (AC ¶¶ 55–57.) Zhang continued to give Givens-Keefer work over her short-term disability leave, and Givens-Keefer again contacted the Omsbudsman in an attempt to get Zhang to stop allocating her work during her leave. (AC ¶¶ 58–59.)

In April 2016, Givens-Keefer returned to work from her leave. (AC ¶ 60.) She needed to return on a restricted schedule with accommodations as recommended by her doctor. (*Id.*) On her first day back, Zhang asked how her "extended vacation" was, and stated, "I wanted to fire you during this meeting[,] but HR won't let me." (AC ¶ 61.) Zhang further informed Givens-Keefer that she was "the worst employee [she had] ever seen," but that HR would not "let her write that." (AC ¶ 62.) Zhang had lowered Givens-Keefer's performance rating as she had indicated she would when she became the group leader, and informed Givens-Keefer that she would continue to lower her performance ratings until she was fired. (*Id.*) Givens-Keefer yet again contacted the Omsbudsman about this conduct. (*Id.*) The Ombudsman stated that Zhang's

"actions were a violation of [company] guidelines," but American Express "took no action." (AC ¶ 63.)

In July 2016, Zhang organized a team dinner outing that Givens-Keefer attended. (AC ¶ 66.) Zhang made disparaging remarks about the perceived sexual orientation of other employees. (*Id.*) When Givens-Keefer did not participate, she "probed about [Givens-Keefer's sexual] orientation and person[al] life in an inappropriate manner in front of the group," stated she "hated" the other employees due to their perceived sexual orientation, and mocked Givens-Keefer for refusing to participate in the conversation. (*Id.*) In August 2016, Zhang mocked Givens-Keefer for carrying a handbag, which she used to carry her emergency medical prescriptions, because it "look[ed] so gay." (AC ¶ 67.) In September 2016, Givens-Keefer met with Zhang because she continued to receive feedback from peers that Zhang was making so many disparaging remarks about her that it was becoming a "toxic and hostile environment." (AC ¶ 68.) Zhang "admitted this," and said that she would try to stop but that she just did not like Givens-Keefer. (*Id.*) In another meeting, Zhang told Givens-Keefer, "you are just not an Alpha, you are not part of this group, I just don't like you and you are virtual . . . and you just don't fit." (AC ¶ 69.) Givens-Keefer again contacted the Omsbudsman and scheduled a meeting with Wallis, Zhang's supervisor. (AC ¶ 70.) Wallis said that American Express had "bent over backward" for Givens-Keefer and was "pejorative" in her response to Givens-Keefer's complaints. (*Id.*)

Zhang further refused to allow Givens-Keefer to use her sick leave, and instead forced her to use vacation time. (AC ¶ 71.) Indeed, Zhang repeatedly overrode Givens-Keefer's time sheets and instructed that her sick days be counted as vacation days. (*Id.*) This impacted the calculation of Givens-Keefer's earned time and disability tolling, causing her to lose several

months of paid short-term disability leave. (*Id.*) Givens-Keefer repeatedly reached out to the Omsbudsman and HR to report the errors in her leave, but it was not corrected in time. (AC ¶ 72.) When she inquired about how to convert short-term disability to long-term disability, HR directed Givens-Keefer to the incorrect provider. (AC ¶ 73.) It took several weeks for her to be connected with the correct provider, which resulted in a gap in her disability tolling. (*Id.*) American Express did not take corrective action, even after being informed about the error, which negatively impacted Givens-Keefer's pay. (*Id.*)

On May 8, 2018, Givens-Keefer brought this suit. (*See* Dkt. No. 1.)

## II. Legal Standard

When deciding a motion to compel arbitration, a reviewing court's evaluation is limited to: (1) "whether a valid agreement or obligation to arbitrate exists," and (2) "whether one party to the agreement has failed, neglected or refused to arbitrate." *LAIF X SPRL v. Axtel, S.A. de C.V.*, 390 F.3d 194, 198 (2d Cir. 2004) (citation omitted). Where these requirements are met, the court must "[direct] the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

## III. Discussion

Givens-Keefer expressly alleges in the operative complaint that she never signed the Arbitration Policy Acknowledgement Form. (*See* AC ¶ 77.) In support of its motion to dismiss, American Express first argues that Givens-Keefer did in fact sign the acknowledgement form, and thereby agreed to arbitrate her claims. (*See* Dkt. No. 42 at 10.) In the alternative, American Express argues that she signed an offer letter that expressly conditions her employment on her agreement to arbitrate. (*See* Dkt. No. 42 at 11–13.) Even if Givens-Keefer did not sign the acknowledgment form, the signed offer letter suffices to establish that "a valid agreement or

6

obligation to arbitrate exists." *See LAIF X SPRL*, 390 F.3d at 198. Accordingly, the motion to compel arbitration is granted.

Givens-Keefer does not dispute that she signed an offer letter accepting the conditions of employment at American Express. (*See* Dkt. No. 48.) And a copy of that offer letter filed by American Express shows that she did sign it on December 14, 2010. (Dkt. No. 44-6 at 3.) The signed offer letter expressly states: "As a new or returning employee of American Express, you are subject to the terms of the American Express Employment Arbitration Policy. The Policy provides that arbitration is the final, exclusive and required forum for the resolution of all employment-related disputes that are based on a legal claim between you and [American Express]." (Dkt. No. 44-6 at 2.) While Givens-Keefer argues that she did not have access to the intranet system that housed the arbitration agreement in the first week of her employment (*see* Dkt. No. 48 ¶ 22), she indisputably received notice of the existence of the arbitration policy before she began her employment. Further, Givens-Keefer worked at American Express for several years. (*See* AC.) After that first week, she does not claim that she had anything other than full access to the intranet system and thereby the arbitration agreement throughout her employment with American Express. (*See* Dkt. No. 48 ¶ 22.)

Therefore, "given the evidence in the record that Plaintiff received notice of [the] arbitration policy at the beginning of her employment and continued to work for" American Express, *Thomas v. Public Storage, Inc.*, 957 F. Supp. 2d 496, 500 (S.D.N.Y. 2013), and that she had access to the arbitration agreement throughout her employment, Givens-Keefer has assented to the arbitration of her claims. Further, the sort of claims that Givens-Keefer brings in this action fall within the scope of the arbitration agreement. The parties agreed to arbitrate "all legal claims that an individual has or in the future may have against [American Express] or its . . .

employees. . . which arise out of or relate to an individual's . . . employment with . . . or separation from [American Express]," including claims based on "discrimination or harassment on the basis of race, gender, . . . age, [or] disability." (Dkt. No. 44-4 at 3.) Accordingly, all of Givens-Keefer's claims are subject to arbitration.

American Express also requests that the Court dismiss the case. The Federal Arbitration Act directs a district court to enter a stay of proceedings in cases where the claims are "referable to arbitration." 9 U.S.C. § 3. "Courts have the discretion to dismiss — rather than stay — an action when *all* of the issues in it must be arbitrated." *Polit v. Global Foods Int'l Corp.*, No. 14 Civ. 7360, 2015 WL 1780161, at *5 (S.D.N.Y. Apr. 20, 2015) (citation omitted). However, because Givens-Keefer brings this action *pro se*, this Court declines to exercise its discretion to dismiss the case. Instead, the case will be stayed to allow the parties to arbitrate Givens-Keefer's claims.

**IV.    Conclusion**

For the foregoing reasons, Defendants' motion to compel arbitration is GRANTED. Defendants' motion to dismiss is DENIED. This case is STAYED pending the outcome of arbitration. The parties are directed to notify the Court within 14 days of the conclusion of arbitration, and, if the arbitration has not concluded by July 1, 2020, to provide a status letter to the Court.

The Clerk of Court is directed to close the motion at Docket Number 41.

SO ORDERED.

Dated: January 21, 2020
         New York, New York

_____
J. PAUL OETKEN
United States District Judge